CEREALINE MANUF'G CO. v. BATES et al.

(Circuit Court, D. Indiana. January 2, 1897.)

No. 8,910.

1. PATENTS—CONSTRUCTION—FOOD PRODUCT.
    A patent for a new food product from maize, which includes hulling, granulating, and steaming, without cooking, and then pressing and drying the particles, by "warm rolling," so as to reduce them to "dry, hard flakes," does not disclose that such a degree of heat is to be applied or developed between the rolls as to convert starch into dextrine; nor is this language sufficient to show that the invention consists in so adjusting and crowding the rolls together as to develop by contact the necessary heat.

2. SAME
    The Gent process and product patent, No. 223,847, for improved alimentary products from corn, is void for want of novelty and invention.

This was a bill in equity by the Cerealine Manufacturing Company against Hervey Bates and Hervey Bates, Jr., for alleged infringement of a patent for a food product from corn.

This is a suit to restrain the alleged infringement of letters patent No. 223,847, dated January 27, 1880, granted to Joseph F. Gent, assignor to himself and Gaff, Gent, and Thomas, for improved alimentary products from corn. The bill of complaint, which is in the usual form, was filed September 30, 1893. The answer denies infringement, and alleges that the patent in suit is invalid for want of patentable invention, for want of novelty, and because the specification of the letters patent does not set forth a complete or useful patentable invention, nor contain a full, clear, and exact description of the alleged invention, and of such manner of making or using the same sufficient to enable a person skilled in the art to make and use the alleged invention. It puts in issue substantially all the allegations of the bill except the granting of the patent, and it sets up a large number of prior patents and publications as exhibiting, in all substantial and material respects, the alleged invention upon which the complainant's patent purports to rest.

The file wrapper, in evidence, shows that, in his original application for a patent

for his alleged invention, the applicant set forth his specification and claims therefor as follows:

"Be it known that I, Joseph F. Gent, of Columbus, in the county of Bartholomew and state of Indiana, have invented a certain new and useful improved alimentary product from corn, and do hereby declare the following to be a full, clear, and exact description of the invention, such as will enable others skilled in the art to which it appertains to make and use the same: The object of my invention is to obtain, from the cereal known by the several names of 'corn,' 'Indian corn,' and 'maize,' a new alimentary product which, from its white and flaky appearance, I term 'Snow Flake,' and to manufacture this new product in such a manner that it shall possess the quality of keeping in any climate. To these ends the first part of my invention consists of the new product, termed 'Snow Flake,' composed of dry flakes made from clipped and purified kernels of corn. The second part of my invention consists of a compound process, the first step of which consists of the separation of the hulls and impurities from the kernels of corn by subjecting the corn to a dry clipping and cracking operation, and by separating the hulls and impurities from the heavier, coarser portions by sifting and winnowing, or either of these operations, to obtain a purified, granular product. The second step of the process consists of the steaming of the granular product for the purpose of softening and toughening the granules. The third step of the process consists of warm-rolling the soft and tough and wet granules for the purpose of pressing the granules into flakes, and of drying and hardening the particles. In order that my invention may be clearly understood, I will proceed to describe the process which I have successfully practiced for the production of the new product from corn. The winnowed kernels of corn may be passed through a suitable mill to crack and hull them, and the cracked grits sifted or bolted to separate the hulls as effectually as practicable, or such kernels of corn may be passed through a cracking, hulling, and separating mill of any known kind, to hull, clip, and crack the kernels, as well as to separate the hulls and clipped portions from the granular cracked portions at one operation. The purified granular material is then subjected to a steaming action in any suitable vessel, the steaming being continued long enough to effect a softening and toughening of the granules. The damp material, which may first be drained and otherwise treated to free it from the greater part of the condensed water, is then pressed and dried, so that the particles shall assume the form and quality of dry, hard flakes. This drying and pressing I have effected successfully by passing the damp material through between warm rollers; but many other means for accomplishing this step of my compound process will readily suggest themselves to any one skilled in the art. What I claim as my invention, and desire to secure by letters patent, is: (1) As a new article of manufacture, the herein described alimentary product from corn which I term 'Snow Flake,' and which consists of dry, hard flakes, made from the hulled kernels. (2) The process, substantially as herein set forth, of making dry, hard flakes from hulled kernels of corn, for the production of a new alimentary product, which process consists of the following steps: First, granulating the corn in the dry state, and separating the hulls therefrom; second, steaming the granular material, to soften and toughen the particles; third, pressing and drying the particles, to reduce them to hard, dry flakes."

The foregoing specification and claims were sworn to by Joseph F. Gent, and filed in the patent office September 1, 1879. On September 16, 1879, the application was rejected, on the ground that the process and product lacked novelty, in view of American patents Nos. 136,305, February 25, 1873, to L. S. Chichester, and 174,346, March 7, 1876, to H. H. Beach. Thereupon the attorney for Mr. Gent submitted certain amendments to the specification, not materially changing the same, and after consideration the application was again rejected.

In ruling against the amended application the patent office said:

"From a perusal of the specification it would be inferred that applicant was the pioneer in this branch of industry. Instead of this the field is covered by prior inventors. The description fails to set forth the state of the art, as required by the office, under the decision in Ex parte Thompson, 16 O. G. 588, and rule 14, that 'a statement of what is old be made, the new thing be distinguished therefrom, and the object to be accomplished by the improvement be set forth.' It is not sufficient that the references are criticised in the argument. Now, it is old to submit cereals to steaming and rolling, as in Ridge's patent, 94,341, August 31, 1869; steaming and

· grinding, as in Beach's process, cited; hulling, grinding, cooking in thin sheets, and breaking or grinding, as shown by 136,305, cited. The applicant's objection to this reference is that Chichester's cereals are cooked. There is no evidence that applicant's are not cooked, as no degree of heat is mentioned in description or claim. The cereals sold by the Cerealine Manufacturing Company of New York are scoured, then hulled, crushed, cooked, and desiccated, under patents 144,508, 153,240, 159,080, 173,211, 184,837, etc. Nor is crushing or flattening a new step. See patent 116,691, to Curtis & Smith, July 4, 1871, in connection with softening by cooking. It is disclaimed by 198,192 to D'Hemense, December 18, 1877, and shown by patent 32,853 (reissued 1,340), to S. R. Andres, July 23, 1861, and Canadian patent, 9,341, November 11, 1878. These show the state of the art, and applicant should clearly distinguish his case therefrom. The article produced by the first three steps of the process claim is common in the markets as 'hominy'; including the next and also the last step they are the Cerealine Manufacturing Company's and Nutrio Manufacturing Company's products; and, in view of the essential steps being in common use, no novelty is apparent in either product or process, as applicant can omit the first three by commencing with hominy. The application is rejected."

Afterwards the specification and claims, without any reverification, were amended to read as follows:

"Be it known that I, Joseph F. Gent, of Columbus, Bartholomew county, and state of Indiana, have invented certain new and useful alimentary products from corn, and I do hereby declare the following to be a full, clear, and exact description of the invention, such as will enable others skilled in the art to which it appertains to make and use the same. The object of my invention is to obtain, from the cereal known by the several names of 'corn,' 'Indian corn,' and 'maize,' a new alimentary product, and to manufacture this new product in such a manner that it shall possess the quality of keeping in any climate. To these ends the first part of my invention consists of the new product, composed of dry flakes made from clipped and purified kernels of corn. The second part of my invention consists of a compound process, the first step of which consists of the separation of the hulls and impurities from the kernels of corn by subjecting the corn to a dry clipping and cracking operation, and by separating the hulls and impurities from the heavier, coarser portions by sifting and winnowing, or either of these operations, to obtain a purified granular product. The second step of the process consists of the steaming of the granular product for the purpose of softening and toughening the granules without cooking the same. The third step of the process consists of warm-rolling the soft and tough and wet granules for the purposes of rolling or pressing the granules into flakes, and of drying and hardening the particles. In order that my invention may be clearly understood, I will proceed to describe the process which I have successfully practiced for the production of the new product from corn. The winnowed kernels of corn may be passed through a suitable mill to crack and hull them, and the cracked grits sifted or bolted, to separate the hulls as effectually as practicable; or such kernels of corn may be passed through a cracking, hulling, and separating mill, of any known kind, to hull, clip and crack the kernels, as well as to separate the hulls and clipped portions from the granular cracked portions, at one operation. The purified granular material is then subjected to a steaming action in any suitable vessel, the steaming being continued long enough to effect a softening and toughening of the granules. The damp material, which may first be drained and otherwise treated to free it from the greater part of the condensed water, is then pressed and dried, so that the particles shall assume the form and quality of dry, hard flakes. This drying and pressing I have effected successfully by passing the damp material through between warm rollers; but many other means for accomplishing this step of my compound process will readily suggest themselves to any one skilled in the art. I am aware that corn has heretofore been hulled and granulated and steamed, and therefore claim neither of these processes; nor do I claim, broadly, a process consisting of the hulling and granulating and subsequent steaming of corn. I claim this compound process only when combined with the step of pressing and drying, as hereinbefore set forth, by which step my process is distinguished from any heretofore known process for the treatment of corn, and the consequence of the practicing of which step in my new process is the production of the new article herein described. What I claim as my invention, and desire to secure by letters patent, is: (1) As a new article of manufacture, the herein described alimentary product from corn, which consists of hulled, dry, hard, uncooked flakes, made from the kernels. (2) The process, substantially

as herein set forth, of making dry, hard flakes from hulled kernels of corn, for the production of a new alimentary product, which process consists of the following steps, viz.: First, crushing the corn in the dry state, and separating the hulls therefrom; second, steaming the granular material, to *soften and toughen the particles*, without cooking the same; third, pressing and drying the particles, to reduce them to dry, hard flakes."

The complainant, pending the suit, filed a disclaimer in the patent office of the following in his specification, viz.: "But many other means for accomplishing this step of my compound process will readily suggest themselves to any one skilled in the art." The evidence taken in the case is voluminous, but it is not necessary to set forth any abstract of the evidence in this statement.

Rowland Cox and Miller, Winter & Elam, for complainant.

Duncan & Smith, Charles Martindale, and Robert H. Parkinson, for defendants.

BAKER, District Judge (after stating the facts). It is apparent, from the foregoing statement, that the field for invention, in view of the prior state of the art, was reduced to narrow limits before the present patent was applied for. This the applicant concedes. He says:

"I am aware that corn has heretofore been hulled and granulated and steamed, and therefore claim neither of these processes; nor do I claim, broadly, a process consisting of the hulling and granulating and subsequent steaming of corn."

The additional step disclosed in the patent consists in passing the granules of corn, when hulled, granulated, and steamed, without cooking, through warm rolls, for the purpose of rolling or pressing the granules into flakes, and drying and hardening the same. The use of rolls for accomplishing this purpose was a matter of common knowledge at the time the patent was applied for. It was also a matter of common knowledge that the friction occasioned by passing grain or granules of corn between rolls so adjusted as to crush or flatten the same would produce heat, depending for its intensity on the closeness of the contact of the rolls to each other. If all that the patent covers consists simply in hulling, granulating, and steaming granules of corn, and then passing the same between rolls so adjusted as to press the granules into dry, hard flakes, it would, as shown by the ruling of the patent office, be anticipated by prior patents, and void for want of patentable invention.

Acquiescing in these views of the patent office, the applicant undertook and was permitted to escape ultimate defeat by so changing his specification as to provide for steaming without cooking the granules of corn, to effect a softening and toughening of the same, before passing them between warm rolls. It is difficult to perceive how this change in the description of the process, nothing more being disclosed, rendered the alleged invention patentable, when, without this change, it had been held not to be patentable. No new mechanical result in the product was claimed by reason of this change; nor is it suggested, or inferable from anything found in the specification and claims, that any chemical change in the product was produced by passing the wet granules, which had been steamed,

without cooking, between warm rolls. Feeling the force of these views, the learned counsel for the complainant maintains that:

"The moist heat, friction, and pressure of the process are such that the flakes which are produced consist in part of soluble starch and dextrine."

He insists, further, that the controlling feature of the new product consists in the presence of dextrine, and that flakes containing dextrine result from the use of the process specified in the patent. The claim of counsel for complainant that the word "hard," as applied to the flakes, ex vi termini imports the presence of dextrine, seems to me unfounded. The use of this word would appear to point to the mechanical effect produced by passing wet granules of corn between warm rolls, so adjusted as to press and dry them, without producing any chemical change therein. The steaming of the granules of corn, without cooking, would not produce dextrine; nor would warm rolls produce such result, unless a high degree of heat was produced in the rolls between which the granules passed. Dextrine can be produced by subjecting starch to a heat of between 170° to 200° Centigrade. Am. Enc. Dict. tit. "Dextrine." It thus becomes apparent that a cooking temperature is required to convert the starch in the granules of corn into dextrine. This is conceded by complainant's expert, who claims that, while a cooking temperature is essential to produce dextrine, it is covered by the patent. It is evident that the granules of corn must be subjected to a cooking temperature long enough to convert a portion of their starch corpuscles into dextrine. This cannot be effected by steaming, without cooking, the sole purpose of which is alleged to be merely to soften and toughen the granules. The cooking heat must, therefore, be found in the warm rolls. It is nowhere stated or indicated that the invention consisted in or depended upon crowding the rolls together sufficiently to develop a cooking temperature.

It is not sufficient that complainant, in common with other manufacturers, may have found that it was desirable, in the use of roller mills, to adjust the rolls to close contact, and run them at high speed. That is what these adjustments were placed in these mills for, from the time such mills were placed upon the market. If these adjustments had been set out in the specification, the claims could not have been construed as resting upon them, unless they in terms limited the invention to such adjustments or temperature. If such an element had been unmistakably embraced in the specification and claims as defining the invention, it would be doubtful whether it could be sustained for making the ordinary adjustments of a roller mill which used only those adjustments which were commonly found in such mills as were sold upon the market for the purpose of varying, at the will of the operator, the closeness of contact and the speed of the rolls. It would seem that, when mills provided with such adjustments were sold in the market, the purchaser would be entitled to use such adjustments to the extent of their capacity, and that the office of the mill could not be appropriated, under the guise of being part of a process patent, by a person who had not invented

the machinery or its adjustments, and who only used it for crushing or pressing cereals, the purpose for which it was made and sold.

If it was already known to those skilled in the art that increased pressure would produce the desired result, so that the public did not need to be told either what pressure to apply, or that unusual pressure was to be applied, in order to secure the desired degree of hardness in the flakes, there would have been no room for invention, and nothing to sustain a patent, in making the requisite adjustments for this purpose. If, on the other hand, it did require invention to discover that a particular adjustment, or a particular temperature in the rolls, would produce a new and useful product, different from any theretofore obtained by the use of rolls upon crushed cereals, it would be essential to the validity of a patent resting on such a discovery to show clearly and unmistakably that the invention consisted in and depended upon such adjustment or temperature. giving some intelligent guide as to what degree of closeness, or of speed, or of temperature, of the rolls was required, or, at least, what degree of cooking was essential to the invention. The words "pressing and drying" convey no indication that the rolls are to be set closer than they are set when ordinarily in use for crushing corn. On the contrary, they convey the idea that they are to be set further apart, so as to press and dry, and not crush, the granules. The term "warm-rolling" conveys no information or suggestion that the rolls are to be raised to a degree of heat sufficient to convert starch into dextrine. This term conveys no definite idea as to the degree of heat to which the rolls must be raised in producing the dry, hard flakes of the patent. The term "warm-rolling" does not naturally suggest to the mind such a degree of heat as is necessary to convert starch into dextrine.

The process does not seem to me to present anything novel in any of its steps, or materially different from what was familiar in the methods of the treatment of grain in common use. And the product of the process is not shown by the specification and claims to constitute any new or useful product, nor can the flake, containing dextrine as its most important and distinguishing feature, be produced without subjecting the wet granules of corn to a cooking temperature, which is not disclosed in the patent. I do not think the complainant is entitled to maintain its patent for a product of corn in the form of a flake, which consists, in part, of soluble starch and dextrine. The applicant, at and for some time after the granting of the patent, warmed his rolls artificially, and only dispensed with such artificial heat after discovering that the friction of the rolls produced sufficient heat to secure the desired degree of dryness and hardness in the flake.

I am not satisfied that the defendants infringe the complainant's process, even if its patent were held valid. The defendants sprinkle their granules of corn with water at the temperature of from 80° to 120° Fahrenheit, and carry them through a system of conveyors to a bin, from which, in about three hours, they are elevated and passed between rolls having only such heat as is produced by the

friction of the rolls. In view of all the evidence in the case, I am of opinion that the complainant has failed to maintain its bill, and that the same must be dismissed, for want of equity, at its costs.